[908 NE2d 885, 880 NYS2d 895]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DALE F. LEESON, Appellant.

Argued April 1, 2009; decided May 5, 2009

824

APPEARANCES OF COUNSEL

*John E. Tyo*, Shortsville, for appellant.

*Dale Leeson*, appellant pro se.

*R. Michael Tantillo, District Attorney*, Canandaigua (*Jeffrey L. Taylor* of counsel), for respondent.

**OPINION OF THE COURT**

MEMORANDUM.

The order of the Appellate Division should be affirmed. Defendant Dale F. Leeson was indicted for committing sex crimes on various occasions from mid-August through late October 2003 in Ontario County against a 12-year-old female victim. Defendant, who was 40 years old at the time, was a longtime friend of the victim's family. The victim's mother brought the matters leading to defendant's indictment to the attention of the Ontario County Sheriff's Office on or about October 21, 2003.

Beginning in August 2003, defendant spent a lot of time at the victim's home in Ontario County, remodeling a bathroom and generally lending a hand with chores. The victim's mother resided there with the 12-year-old victim, who was enrolled in special education classes during the regular school year, and her 13-year-old brother. Defendant never asked the victim's mother for any money, telling her that he was helping out "as a favor because [she] needed someone around the house." Defendant

lavished gifts on the victim, including games and clothing and, in particular, panties; when the victim wanted her belly button pierced, defendant paid for the piercing and a ring; he took the victim to the New York State Fair, accompanied by his brother and sister-in-law.

During the summer of 2003, the victim frequently played at her house with defendant's daughter, who was about the same age. Defendant would drive his daughter to her mother's or grandmother's house in Wayne County in the late afternoon after these "play dates." The victim either asked or was invited to go along on these trips, which often included stops on the way to Wayne County for ice cream and fast food or bowling. The victim claimed that on the return trips to her home in the evening—after defendant had dropped off his daughter—he would pull the vehicle he was driving (usually a white Toyota pickup truck) off onto the side of the road near her house, douse its engine and lights, and engage in sexual contact with her. According to the victim, defendant kept panties in the pickup truck's glove compartment, and sometimes photographed her in a provocative position wearing this underwear during these sexual encounters. No pictures fitting this description were found in two searches of the pickup truck (the first one, warrantless) and a search of defendant's residence.

Twice in late August or early September 2003, defendant took the victim and her brother to Penn Yan in neighboring Yates County, ostensibly to clean a two-story building with a vacant apartment on the ground floor and an office area on the second floor. Defendant cast these trips as an opportunity for the children to earn pocket money. He directed the victim's brother to steam clean the floor in the downstairs apartment on both occasions, although the two trips to Penn Yan were only about a week apart. Defendant then disappeared with the victim upstairs, and locked both the outside and inside doors to the second floor office area, which prevented her brother from entering unannounced. According to the victim, when she was with defendant, he showed her pictures of a sexual nature in magazines (apparently Playboy magazine), and engaged in sexual contact with her. Both times, the victim's brother, after finishing his work downstairs, went upstairs to use the bathroom and to check on his sister. Both times, the victim's brother was forced to wait a few minutes after knocking on the locked door before defendant admitted him into the office area.

The victim's brother expressed misgivings to his mother about what might have been happening between his sister and defen-

dant in the Penn Yan building behind locked doors. She vowed to question the victim, and "told [the victim's brother] just to try to keep quiet about it and talk to [the victim] and see if [he could] get it out of her." At some point in the fall of 2003, the victim's mother observed defendant and the victim lying together on the victim's bed. The victim's blouse was pulled up and defendant was kissing her stomach. When the victim's mother asked defendant what he was doing, he replied that "they were just sitting there talking and he was trying to put [the victim] to sleep." Other times, the victim's mother observed her daughter sitting on defendant's lap or lying down with her head on his lap. Defendant called the victim "his special little girl."

According to the victim, defendant told her "[a] lot" that he loved her and wanted to marry her; he warned her that if she told anyone what happened when they were alone, "he would go to jail." Although "[u]pset" by defendant's sexual advances, the victim did not say anything to anyone until questioned by law enforcement authorities. Defendant has adamantly denied any sexual contact with the victim.

After the completion of a jury trial in May 2005, defendant was convicted of two counts of sodomy in the second degree, each occurring approximately in mid-August 2003; one count of sexual abuse in the second degree, occurring approximately in mid-August 2003; and one count of endangering the welfare of a child, taking place roughly from mid-August to late October 2003. He was sentenced to an aggregate prison term of 4$^2$/$_3$ to 14 years. The Appellate Division subsequently affirmed, with two Justices dissenting (48 AD3d 1294 [2008]), and a Judge of this Court granted defendant leave to appeal (10 NY3d 961 [2008]). We now affirm.

Defendant complains about the admission of the testimony that he committed uncharged acts of sodomy and sexual abuse against the victim in Yates County. Defendant emphasizes that four witnesses—the victim, her mother, her brother and the owner of the Penn Yan building, who testified that he engaged defendant to "redo[ ] the apartment downstairs"—were allowed to give evidence on this score.

■ This testimony did not deprive defendant of a fair trial. "Evidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than defendant's criminal propensity . . . Where there is a proper nonpropensity purpose, the decision whether to admit [such]

evidence . . . rests upon the trial court's discretionary balancing of probative value and unfair prejudice" (*People v Dorm*, 12 NY3d 16, 19 [2009] [citations omitted]). Here, as in *Dorm*, the uncharged acts involved the very same victim as the charged acts. In addition, the uncharged acts were claimed to have occurred in late August or early September 2003—during the very same time period as the crimes that defendant was accused of committing were alleged to have happened. As a result, the testimony relating to the two visits to Penn Yan "provided necessary background information on the nature of the relationship" between defendant and the victim, and "placed the charged conduct in context" (*id.*). In short, this testimony was relevant for a purpose other than defendant's criminal propensity, and its admission by the trial court was not an abuse of discretion.

■ Finally, even assuming that the initial, warrantless search of defendant's pickup truck was unlawful, the error was harmless. The only physical evidence recovered during this search, confined to the glove compartment, was panties. The testimony of the victim and her mother independently established that the victim was often alone with defendant in the pickup truck, and that he bought her panties. There is no " 'reasonable possibility that the . . . [error] might have contributed to the conviction' " (*People v Crimmins*, 36 NY2d 230, 241 [1975], quoting *Fahy v Connecticut*, 375 US 85, 86 [1963]).

Chief Judge Lippman and Judges Ciparick, Graffeo, Read, Smith, Pigott and Jones concur.

Order affirmed in a memorandum.