People v Werkheiser (2019 NY Slip Op 02749)





People v Werkheiser


2019 NY Slip Op 02749


Decided on April 11, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 11, 2019

108317

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
JULIE K. WERKHEISER, Appellant.

Calendar Date: February 14, 2019

Before: Clark, J.P., Mulvey, Aarons, Rumsey and Pritzker, JJ.


Pamela B. Bleiwas, Ithaca, for appellant.
Kirk O. Martin, District Attorney, Owego (Cheryl A. Mancini of counsel), for respondent.



MEMORANDUM AND ORDER
Pritzker, J.
Appeals (1) from a judgment of the County Court of Tioga County (Keene, J.), rendered February 5, 2016, upon a verdict convicting defendant of the crime of predatory sexual assault against a child (two counts), and (2) by permission, from an order of said court, entered May 23, 2018, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
Following a jury trial, defendant was found guilty of two counts of predatory sexual assault against a child stemming from the sexual abuse of victim A (born in 1998) and victim B (born in 1999) from July 2006 to November 2007 at the dance studio where defendant was an instructor in the Village of Waverly, Tioga County [FN1]. Defendant was sentenced to a prison term of 11 years to life for each count, with the sentences to run concurrently. Defendant subsequently filed a pro se motion to vacate the judgment of conviction pursuant to CPL 440.10 on the ground that new evidence had been discovered since the entry of judgment. County Court denied the motion without a hearing. Defendant now appeals from the judgment of conviction and, by permission, from the denial of her CPL 440.10 motion. We affirm.
Initially, as defendant concedes, her challenge to the legal sufficiency of the evidence is not preserved given that trial counsel's motion for a trial order of dismissal at the close of the People's proof was not "specifically directed at the errors being urged on appeal" (People v Cruz, 131 AD3d 724, 724 [2015] [internal quotation marks, brackets and citations omitted], lv denied 26 NY3d 1087 [2015]; see People v Stahl, 53 NY2d 1048, 1050 [1981]). "However, a weight of the evidence challenge, which bears no preservation requirement, also [*2]requires consideration of the adequacy of the evidence as to each element of the crimes" (People v Perillo, 144 AD3d 1399, 1400 [2016] [internal quotation marks and citations omitted], lvs denied 29 NY3d 948, 951 [2017]; accord People v Cruz, 131 AD3d at 725). "Under a weight of the evidence analysis, if a different result would not have been unreasonable, this Court must then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Fournier, 137 AD3d 1318, 1319 [2016] [internal quotation marks, brackets and citations omitted], lv denied 28 NY3d 929 [2016]; see People v LaDuke, 140 AD3d 1467, 1468 [2016]).
As relevant here, "[a] person is guilty of predatory sexual assault against a child when, being [18] years old or more, he or she commits the crime of . . . course of sexual conduct against a child in the first degree . . . and the victim is less than [13] years old" (Penal Law § 130.96). A person commits the crime of course of sexual conduct against a child in the first degree "when, over a period of time not less than three months in duration[,] . . . he or she, being [18] years old or more, engages in two or more acts of sexual conduct, which include at least one act of . . . oral sexual conduct,
. . . with a child less than [13] years old" (Penal Law § 130.75 [1] [b]).
Victim A, who was 17 years old at the time of trial, testified that she was born in 1998 and was eight to nine years old during the sexual conduct. From July 2006 to November 2007, victim A took dance lessons almost daily at the studio where defendant was an instructor. Victim A testified that, when the lessons were over and the other students had gone, defendant would take victim A into a closet located on the lower level of the studio and she would stick her fingers and her tongue into victim A's vagina. Victim A testified that the same sexual conduct occurred in a storage room in the upstairs of the dance studio. Victim A further testified that she did not remember how many times the sexual conduct occurred in the closet, stating that it happened "[a] lot" and that there was not a month during which it did not happen from July 2006 to November 2007. Victim A also explained that she watched defendant subject victim B to the same sexual conduct multiple times from July 2006 to November 2007. Victim A testified that during the sexual conduct that happened both to her and to victim B, defendant sang lullabies with words in a different language. Victim A also explained that she does not have a good relationship with victim B, and that they "never talked about" the sexual abuse by defendant.
Victim A further explained that she did not tell anyone about the sexual conduct because she believed that it was her fault and, moreover, defendant told victim A that if she told anyone, defendant would kill her. Victim A acknowledged that she previously told a Child Protective Services worker that she did not witness defendant touch anyone and was not sure if defendant did anything to her. Victim A explained that she did not say anything about the sexual abuse until the fall of 2013 because she did not remember it. Victim A described two specific events that triggered her memory of the sexual abuse.
Victim B, who was 16 years old at the time of trial, testified that she was born in 1999. Victim B explained that she attended the studio where defendant worked and, from July 2006 to November 2007, defendant sexually abused her in an upstairs room at the dance studio by touching victim B's chest and putting her fingers and tongue in victim B's vagina. Victim B explained that the abuse also occurred downstairs in the dance studio. Victim B testified that this sexual conduct occurred more than two times per month from July 2006 to November 2007. Victim B recalled that defendant sang during the sexual conduct and, that if victim B cried, defendant would tell her to "shut up" and that she would send someone after her. Victim B testified that she first told her stepmother about the sexual abuse but that she did not remember when. She also testified that she and victim A were not abused together, but that she had a feeling, although she never saw it, that victim A was abused. However, she did observe victim A come out of the bathroom area upstairs crying on more than two occasions. Victim B acknowledged that when she talked to other people about the sexual abuse, she stated that it always happened in the same room and that defendant took off her clothes, although at trial, she testified that either she or defendant took off her clothes and that she had no knowledge of [*3]defendant abusing anyone else at the dance studio. Also, victim B acknowledged that, during prior testimony, she stated that defendant did not threaten her.
Stephan Perkowski, a licensed clinical social worker, testified about Child Sexual Abuse Accommodation Syndrome and certain characteristics that are commonly observed in cases of child sexual abuse. Perkowski also testified about delayed disclosure, specifically explaining that the story of a sexually abused child generally comes in "piece-meal" and rarely comes out in full the first time the child is interviewed. Perkowski explained that many factors prompt delayed disclosure, including proximity or lack of proximity to the alleged offender, coming to terms with what happened to the child and feeling less pressure about sexual abuse. He explained that threats also play a role in delayed disclosure because the younger the child is, the more likely he or she is to believe that the threat is real and can happen. Kevin Antshel, an associate professor of psychiatry, testified about phenylketonuria (hereafter PKU), a medical condition that affects both victim A and victim B. According to Antshel, PKU affects working memory but not long term memory. Defendant's sister testified that defendant was born in 1976. Defendant testified that victims A and B took dance lessons at her dance studio but denied any sexual abuse or threats. Three witnesses, all of whom were involved with the dance studio and knew defendant and both victims, testified that they never observed any sexual conduct between defendant and the victims.
While some of the victims' testimonies were inconsistent, both with one another and with their own prior statements, "it is not uncommon for young children to be uncertain and even inconsistent in their trial testimony" (People v Russell, 116 AD3d 1090, 1092 [2014] [internal quotation marks and citations omitted]). Nor do we find that these inconsistencies render the victims' testimonies "inherently unbelievable or incredible as a matter of law" (id. at 1092; see People v Beauharnois, 64 AD3d 996, 999 [2009], lv denied 13 NY3d 834 [2009]). Also, both victims testified that their delay in reporting was due to threats and lack of memory (see People v Reynolds, 81 AD3d 1166, 1166-1167 [2011], lv denied 16 NY3d 898 [2011]). Additionally, these issues were fully revealed at trial and explored during defendant's cross-examination of both victims and presented credibility questions to be resolved by the jury (see People v Chaneyfield, 157 AD3d 996, 1000 [2018], lv denied 31 NY3d 1012 [2018]; People v Russell, 116 AD3d at 1092). Therefore, viewing the evidence in a neutral light and according great deference to the jury's credibility determinations given their opportunity to view the victims' demeanors and assess their credibility in light of these concerns, we find the verdict to be in accord with the weight of the evidence (see People v Chaneyfield, 157 AD3d at 1000; People v Russell, 116 AD3d at 1092).
We turn next to defendant's contention that she was deprived of a fair trial due to County Court's evidentiary rulings. Specifically, defendant asserts that the court improperly denied her request for a taint hearing. "Although there is no express statutory authority for a hearing to determine whether the testimony of a child witness has been tainted by suggestive interviewing techniques, a court nonetheless may — upon a proper showing by the defendant — direct that a pretrial taint hearing be held" (People v Muckey, 158 AD3d 954, 955 [2018] [internal quotation marks, brackets and citations omitted], lv denied 31 NY3d 1015 [2018]; see People v Milford, 118 AD3d 1166, 1168 [2014], lv denied 23 NY3d 1065 [2014]). In an affidavit to support her motion for a taint hearing, defendant contended, among other things, that there was manipulation of the victims because the claims of sexual abuse against defendant came about in the context of a custody dispute between the victims' mother and father and a neglect petition filed against defendant that was related to her newborn son. Because defendant's claims of manipulation were purely speculative, we find that County Court did not abuse its discretion in denying the request for a taint hearing (see People v Muckey, 158 AD3d at 955; People v Nickel, 14 AD3d 869, 870-871 [2005], lv denied 4 NY3d 834 [2005]).
Defendant also argues that County Court improperly denied her request to introduce the victims' father's sex offender status, which she argues was relevant to the father's motivation to manipulate the victims to make their sexual abuse allegations. A defendant has a constitutional right to present a defense, however, "it is well established that the trial courts have [*4]broad discretion to keep the proceedings within manageable limits and to curtail exploration of collateral matters" (People v Spencer, 20 NY3d 954, 956 [2012] [internal quotation marks, brackets and citation omitted]; see People v Grant, 60 AD3d 865, 865 [2009]). Although proof that tends to establish a motive to fabricate is not collateral and may not be excluded on that ground, a trial court may exclude testimony that attempts to indirectly attack a victim's credibility by attacking the credibility of a third party (see People v Brown, 128 AD3d 1183, 1187 [2015], lv denied 27 NY3d 993 [2016]), which is precisely what defendant sought to do here. Accordingly, County Court properly excluded the evidence of the father's sex offender status because the link between this status and the victims' alleged fabrication is too attenuated (see People v Brown, 128 AD3d at 1187; compare People v Spencer, 20 NY3d at 956) and could lead the jury to speculate as to the relationship between the father and the victims, which did not relate to any material issues in the case (see generally People v Ramsaran, 154 AD3d 1051, 1053 [2017], lv denied 30 NY3d 1063 [2017]; People v Collins, 126 AD3d 1132, 1133 [2015], lv denied 25 NY3d 1161 [2015]). Further, the record reveals that the father was cross-examined regarding a conviction for which the mother was the victim, which was sufficient to allow defendant to advance her theory of possible fabrication.
Likewise, defendant asserts that County Court improperly ruled that she could not call two students at the dance studio as witnesses. Defendant sought to call these witnesses to present evidence that the victims made false accusations that these two students were abused by defendant. "Generally, a party may be precluded from introducing extrinsic evidence of collateral matters when the sole purpose of offering such evidence is to impeach credibility" (People v St. Louis, 20 AD3d 592, 593 [2005] [citations omitted], lv denied 5 NY3d 856 [2005]; see People v Blanchard, 279 AD2d 808, 811 [2001], lv denied 96 NY2d 826 [2001]). Given that the testimony of these two students did not have any direct bearing on the material issues of the case, it was collateral and properly excluded (see People v St. Louis, 20 AD3d at 594; People v Blanchard, 279 AD2d at 811).
We turn next to defendant's contention that County Court erred in allowing the expert testimony of Perkowski and Antshel. The admissibility of expert testimony is left primarily to the discretion of the trial court and, absent an abuse of discretion, that decision should not be disturbed (see People v Williams, 20 NY3d 579, 584 [2013]; People v West, 166 AD3d 1080, 1086 [2018], lv denied 32 NY3d 1129 [2018]). Expert testimony is admissible on subjects related to professional or scientific knowledge that are not within the range of ordinary training or intelligence of the jury and would assist the jury (see People v Rivers, 18 NY3d 222, 228 [2011]; People v Ramsaran, 154 AD3d at 1055). "[E]xpert testimony regarding . . . abused child syndrome or similar conditions may be admitted to explain behavior of a victim that might appear unusual or that [the trier of fact] may not be expected to understand" (People v Carroll, 95 NY2d 375, 387 [2000]; see People v Hughes, 114 AD3d 1021, 1024 [2014], lv denied 23 NY3d 1038 [2014]).
We find that County Court properly admitted the testimony of Perkowski because his testimony permitted the jury to understand why, in general, victims of child abuse delay reporting and why they might not report the full story with all of the details from the outset (see People v Carroll, 95 NY2d at 387). Importantly, this testimony was also properly admitted for the purpose of rebutting defendant's contention that the victims did not report the incident when it happened and did not report the full story when they first disclosed it (see People v Spicola, 16 NY3d 441, 465 [2011], cert denied 565 US 942 [2011]). Also, Perkowski did not render an opinion as to whether the victims were sexually abused and testified that he was not familiar with defendant or this case (compare People v Williams, 20 NY3d at 584; People v Taylor, 75 NY2d 277, 293 [1990]). Similarly, County Court properly allowed Antshel's testimony. His general explanation of what PKU is and how it affects a child's memory was helpful to the jury as it explained a condition from which the victims suffered, which was relevant to whether they remembered the events that occurred from July 2006 to November 2007 (see People v Rivers, 18 NY3d at 228; People v Ramsaran, 154 AD3d at 1055).
We now turn to defendant's contentions regarding County Court's denial of her CPL 440.10 motion without a hearing. Specifically, defendant contends that County Court erred because a video of a 2011 interview of the victims is newly discovered evidence warranting a new trial. A judgment of conviction may be vacated if the defendant shows that the newly discovered evidence fulfills all the following requirements: "(1) [i]t must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could have not been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be cumulative to the former issue; and, (6) it must not be merely impeaching or contradicting the former evidence" (People v Tucker, 40 AD3d 1213, 1214 [2007] [internal quotation marks and citations omitted], lv denied 9 NY3d 882 [2007]; see CPL 440.10 [1] [g]; People v Salemi, 309 NY 208, 216 [1955], cert denied 350 US 950 [1956]; People v Lackey, 48 AD3d 982, 983 [2008], lv denied 10 NY3d 936 [2008]).
In 2011, as a result of a disclosure by the victims regarding sexual abuse by their mother, the victims were interviewed by investigators at the Binghamton Police Department. In that interview, which was videotaped, the victims stated that they were not abused by defendant. Ultimately, the mother was prosecuted by the Broome County District Attorney's office. Subsequently, in 2013, after the victims disclosed that they were abused by defendant at the dance studio, the police department in the Village of Waverly was contacted to conduct an investigation. After defendant was indicted in Tioga County based upon the 2013 disclosure, defense counsel filed an omnibus motion accompanied by an affidavit stating, as relevant here, that the victims were previously questioned by the Binghamton police in 2011 and that the victims did not allege any sexual abuse by defendant in that interview. According to an affidavit of Cheryl Mancini, a Tioga County Assistant District Attorney, before the trial, she went to the Broome County District Attorney's office to ensure compliance with defense counsel's motion requesting any and all Brady material. During the meeting, the Broome County District Attorney's office did not provide or advise Mancini of the video. Mancini also met with defense counsel, who told her that he had the full file from the mother's case in Broome County, but he did not mention the video. Mancini further stated that she did not know or hear of the video until January 2017 when she spoke with Thomas Jackson, a Broome County Special Assistant District Attorney, who was prosecuting the mother in her second trial. Mancini then viewed the video, which contained interviews of both victims. Also, in support of her CPL article 440 motion, defendant contended that she learned about the video in February 2017, when it was admitted into evidence at the mother's second trial. Defendant averred that she thereafter contacted her trial counsel about his knowledge of the video, but never received a response.
In light of these circumstances, County Court properly denied defendant's motion. First, defendant failed to show that the video was newly discovered evidence because defense counsel was aware of the contents therein, specifically what the victims said during the recorded interview, prior to defendant's trial (see People v Lalonde, 160 AD3d 1020, 1027-1028 [2018], lv denied 31 NY3d 1118 [2018]; People v Cain, 96 AD3d 1072, 1073 [2012], lv denied 19 NY3d 1101 [2012]). Moreover, defendant failed to explain why she could not have discovered this video with the exercise of due diligence, especially given that defense counsel had the full file of the mother's case prior to trial (see People v Wright, 88 AD3d 1154, 1158 [2011], lv denied 18 NY3d 863 [2011]; People v Watkins, 49 AD3d 908, 910 [2008], lv denied 10 NY3d 965 [2008]). Also, in light of the cross-examination of both victims, wherein defense counsel questioned them about their delayed disclosures and prior inconsistent statements regarding defendant's sexual abuse, defendant failed to show that the video would probably change the result of the trial (see CPL 440.10 [1] [g]; People v Terry, 44 AD3d 1157, 1159 [2007], lv denied 10 NY3d 772 [2008]; People v Hogencamp, 300 AD2d 734, 736 [2002]).
We are similarly unpersuaded by defendant's assertion that County Court erred in finding a Brady violation based upon the fact that that the People did not provide defendant with the video prior to trial. "To establish a Brady violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the [*5]suppressed evidence was material" (People v Mangarillo, 152 AD3d 1061, 1064 [2017] [internal quotation marks and citations omitted]; see People v Fuentes, 12 NY3d 259, 263 [2009]). Although the video is impeachment evidence, defendant did not demonstrate that it was suppressed by the People or that she was prejudiced thereby. Mancini's affidavit established that the video was created during the Broome County investigation, which was completely separate from the Tioga County investigation and prosecution, and that she was not in possession of the video prior to defendant's trial (see People v Garrett, 23 NY3d 878, 889 [2014]; see generally People v Mangarillo, 152 AD3d at 1064). The video also cannot be considered suppressed by the People because defense counsel knew, or should have known, about the video (see People v LaValle, 3 NY3d 88, 110 [2004]). Also, defendant has failed to show that the video was material — i.e., that there was a reasonable probability that it would have changed the outcome of the trial (see generally People v Fuentes, 12 NY3d at 264-265; People v Yedinak, 157 AD3d 1052, 1056 [2018]). Lastly, County Court did not abuse its discretion in denying defendant's motion without a hearing because defendant's motion was not based "upon nonrecord facts that are material and, if established, would entitle the defendant to relief" (People v Lalonde, 160 AD3d at 1026-1028 [internal quotation marks and citations omitted]; see People v Satterfield, 66 NY2d 796, 799 [1985]). Defendant's remaining contentions have been examined and are without merit.
Clark, J.P., Mulvey, Aarons and Rumsey, JJ., concur.
ORDERED that the judgment and order are affirmed.



Footnotes

Footnote 1: Victim A and victim B are sisters, and their mother has been in a romantic relationship with defendant since the victims were very young.